J-S08045-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: A.H., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.H., NATURAL FATHER | : | No. 1707 WDA 2019 |

Appeal from the Order Entered November 1, 2019
in the Court of Common Pleas of Greene County
Orphans' Court at No(s): 21 O.A. 2019

BEFORE: OLSON, J., McCAFFERY, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                    **FILED APRIL 09, 2020**

S.H. ("Father") appeals from the Order granting the Petition filed by the Greene County Children and Youth Services ("CYS" or the "Agency") seeking to involuntarily terminate his parental rights to his minor daughter, A.H. ("Child") (born in July 2017), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1]  We affirm.

The Agency has been involved with Child since birth, after she was born with illegal substances in her system.  On June 7, 2018, Child was adjudicated dependent, and officially placed into CYS custody.  On July 24, 2019, the Agency filed a Petition seeking the involuntary termination of the parental rights of Mother and Father to Child.  The trial court appointed counsel for

_____

[1] The trial court thereafter voluntarily terminated the parental rights of Child's mother, A.L. ("Mother").  Mother has not filed an appeal of her own, nor has she filed a brief in this appeal.

Father, Mother, and Child. The trial court also appointed a guardian *ad litem* ("GAL") for Child.

On October 31, 2019, the trial court held an evidentiary hearing on the Petition.[2] At the hearing, Mother and Father were present with their counsel. Child was represented by both her legal counsel and her GAL. Child was present in the courtroom, but was too young to speak. N.T., 10/31/19, at 14.

Victoria Stewart ("Stewart"), a former CYS employee who was the caseworker assigned to Child's case, testified that she reviewed a family service plan ("FSP") with Father in February 2018, while he was in jail. *Id.* at 24-25. Stewart asked Father to contact CYS when he was released, so that he could have greater involvement with Child. *Id.* at 25. During the period between April and May 2018, Father was not at the home with Mother and Child, and CYS did not know his whereabouts. *Id.* at 19, 25. CYS had only a mailing address for what Stewart believed was the home of Child's paternal grandfather, but did not have any proof of whether Father resided there, and did not have any other contact information. *Id.* at 25.

---

[2] At the commencement of the involuntary termination case concerning Father, the trial court entered an Order reflecting the parties' stipulation to the continuation of Child as dependent and under the care and custody of CYS for proper placement.

Since June 7, 2018,[3] Father did not attend any visits with Child at CYS during the periods that he was not incarcerated. *Id.* at 21-22. The visits were scheduled to occur weekly, but they were changed to occur bi-weekly after Father did not attend the weekly visits. *Id.* at 22. CYS did not know Father's whereabouts during several periods after CYS took custody of Child. *See id.*; *see also id.* at 20 (wherein Stewart testified that CYS could not locate Father between August 2018 and January 2019, when he was arrested). Father has also been incarcerated on multiple occasions. *Id.* at 20.[4]

At some point after CYS took custody of Child, CYS discovered a valid phone number for Father. *Id.* Stewart spoke with Father over the phone and requested him to come to CYS's office to review Child's services, and sign releases of information so that CYS could make the referrals. *Id.* Father did not attend any of the scheduled meetings. *Id.* at 20, 27. Stewart testified that she asked Father to participate in services and sign privacy releases to enable CYS to make a referral for services, but he did not sign the releases. *Id.* at 20-21, 26.

Stewart additionally stated that the FSP goals for Father have remained the same since May 2018. *Id.* at 20-21, 27. CYS requested that Father review

---

[3] At some time prior to taking custody of Child, CYS discussed with Father the possibility of kinship placement. N.T., 10/31/19, at 31. Father offered his aunt for kinship placement, but CYS denied the placement due to concerns about her background check and her live-in paramour. *Id.* at 31-32, 33, 34.

[4] Father had one visit with Child on February 12, 2019, while he was at the Greene County Jail. *See* N.T., 10/31/19, at 22, 29-30. Because the visit at the jail went very poorly, CYS suspended visits. *Id.*

the FSP at the CYS office, but Father refused. *Id.* at 20-21. Father's goals under the FSP were to obtain a drug and alcohol assessment and follow recommendations; obtain a mental health assessment and follow recommendations; complete parenting classes and SAFE parenting classes; obtain and maintain adequate and appropriate housing; and maintain contact with CYS. *Id.* at 23. Father did not complete these goals or maintain contact with CYS. *Id.* Father has not completed a drug and alcohol or mental health evaluation, although the probation office informed Stewart that Father was unsuccessfully discharged from rehabilitation in April 2019, following his release from the Greene County Jail. *Id.* at 28.

Further, Stewart testified that during the time she was the caseworker assigned to the case, Father never called her to inquire about how Child was doing, never sent any letters or gifts to CYS for Child, and never sent any birthday or Christmas cards or gifts to CYS for Child. *Id.* at 20-21. Father is not paying child support for Child. *Id.* at 22-23.

The GAL has visited Child in her pre-adoptive foster home. *Id.* at 32. The GAL found that Child has adjusted well, and has an obvious bond with the foster parents and the other children who reside in the home. *Id.* Child has been placed in the home since June 1, 2018, and, at the time of the hearing, had lived in the foster home for 95% of her life. *Id.*

Next, CYS presented the testimony of Bradley Hartman ("Hartman"), who is employed by Greene County Probation and Parole, and has been Father's probation/parole officer since December 2016. *Id.* at 35-36, 38.

Hartman presented testimony concerning Father's extensive criminal history, probation violations, drug use, and time spent in prison. *See id.* at 36-39. Hartman stated that in April 2019, Father was released to a rehabilitation program at Cove Forge. *Id.* at 38-39. Father was administratively discharged before completing the program because he was not compliant. *Id.* at 39-40. At that point, Father did not have much time to complete on his jail sentence, and the Greene County Probation Office did not take any action. *Id.* at 40.

Finally, CYS presented the testimony of Amy Hunyady ("Hunyady"), who is a social service aid for CYS responsible for supervising the visits between Father and Child at the Greene County Jail. *Id.* at 42-44. Hunyady testified that, of the 20 supervised visits that were scheduled to occur between Father and Child, only one took place, and it was at the Greene County Jail. *Id.* at 43-44. On the day of the scheduled visit, Hunyady met Child and her foster parents at the jail, and Child was in apparent distress. *Id.* at 44. Hunyady supervised the visit between Child and Father from the other side of glass. *Id.*; *see also id.* at 47-48 (wherein Hunyady clarified that Child and Father were together on the same side of the glass). The secretary at the jail held Child's hand and walked Child to Father, and Child immediately began crying. *Id.* The secretary brought blocks and asked Child if she wanted to play, and Child responded affirmatively. *Id.* Child was still crying, but had become somewhat calmer. *Id.* at 44-45. After playing with the secretary for a few minutes, Child went to the door and began banging on it until someone opened

it. *Id.* at 45. Child took off running up the hallway toward the other inmates.[5] *Id.* Child did not appear to know Father. *Id.* While Child was in the room with Father, Father had asked Hunyady for advice on how to proceed, stating that Child did not appear to know him. *Id.* Hunyady advised him to interact with Child and make Child comfortable. *Id.* Father sat next to Child for a minute, but Child still was crying. *Id.*

When he was not in jail, Father never contacted CYS regarding visits. *Id.* Both prior to and during Father's incarceration, Hunyady notified him of the visits with a time and date. *Id.* at 46; *see also id.* (wherein Hunyady stated that the jail receives e-mail copies of visitation letters). After Father was released from the Greene County Jail, he never contacted CYS to re-start the visits. *Id.* In an Order dated March 6, 2019, in Child's dependency case, the trial court suspended Father's visitation with Child, and directed that Father may start visitation, upon agreement, after his release from incarceration. *Id.* at 46, 49; CYS Ex. 1.

Finally, Father testified that he currently resides at the Greene County Jail, and, when he is not incarcerated, he resides in his father's home in

---

[5] Hunyady stated that she supervises visits between children and parents at the jail, and it is not unusual for children to have stress about visiting a parent in jail. N.T., 10/31/19, at 48. Child was different, in that she took off running when the door was open for a split second, and Hunyady found this behavior dangerous. *Id.*

Greensboro, Pennsylvania.[6]  N.T., 10/31/19, at 50.  Father stated that he resided with his father while he was on probation from June 2018 to January 2019.  *Id.* at 52.  Father testified that he had drug issues and was not attending anything with CYS during that period.  *Id.*  Father acknowledged that he did not visit Child while he was on probation.  *Id.*  Father testified that he did not attend meetings or visits with Child at the Agency's office because he believed he would be arrested on outstanding warrants.  *Id.* at 53, 59. Father never signed any releases for CYS to receive any information throughout Child's dependency.  *Id.* at 61-62.  Father admitted that he never sent Child any birthday cards or Christmas gifts, or any cards and/or letters telling her how much he loves her.  *Id.* at 62.  Father also explained that he had substance abuse issues during the period between June 2018 and January 2019, and he did not seek rehabilitation for his drug issues until he was incarcerated.  *Id.* at 53-54.

Regarding the FSP requirements, Father stated that he had a drug and alcohol evaluation performed after a March 2019 hearing regarding aggravated circumstances.  *Id.* at 54.  Father stated that the evaluation had recommended rehabilitation, and that he had gone to rehabilitation from jail. *Id.*  Father testified that, when he went to Cove Forge for rehabilitation, he received a dual diagnosis, for both drug and alcohol abuse, and mental health,

_____

[6] Father admitted that his father had obtained a Protection From Abuse Order against him, but claimed he does not know the reason.  N.T., 10/31/19, at 58.

but indicated that he did not sign a release for CYS to receive this evaluation. *Id.* at 54. Aside from his Cove Forge dual diagnosis evaluation, Father had neither independently complied with the FSP requirement that he undergo a drug and alcohol evaluation and treatment, nor a mental health evaluation. *Id.* at 54-55. Father stated that he was incarcerated pending burglary and related charges at the time of the hearing. *Id.* at 55-56.

Father testified that he believed that, if he were to "go to rehab and complete it[,]" and "do all of the things [he is] supposed to do, that [he could] get [his] life back together[.]" *Id.* at 56. Father stated that he loves Child and cares about her "a lot." *Id.* Father testified that, aside from the visit at the jail, he was unsure of the last time he had seen Child. *Id.* at 57. Father stated that Cove Forge "absolutely" did not have his consent to release information to his PO regarding his unsuccessful discharge from the program. *Id.* Father indicated that he did not want to have his parental rights terminated because he would like to take some measures to be able to parent Child. *Id.* at 60.

At the conclusion of the hearing on October 31, 2019, the trial court terminated Father's parental rights to Child.[7] Father timely filed a Notice of Appeal, along with an accompanying Concise Statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). On November 22, 2019, the trial court filed a Statement Pursuant to Pa.R.A.P. 1925(a), incorporating

---

[7] The Order was entered on the docket on November 1, 2019.

the reasoning set forth in the termination Order (which was orally read into the record, as well as separately issued in writing).

On appeal, Father raises the following issues:

1. Whether the trial court abused its discretion in finding that [CYS] had proven by clear and convincing evidence that [Father] had[,] by conduct continuing for a period of at least six (6) months immediately preceding the filing of the [P]etition[,] either had evidenced a settled purpose of relinquishing his parental claim to the [C]hild … or had refused to perform such parental duties under 23 Pa.C.S.[A.] §[]2511(a)(1)[?]

2. Whether the trial court abused its discretion in finding that [CYS] had proven[,] by clear and convincing evidence[,] that [Father], by repeated and continued incapacity, abuse, neglect or refusal of the parents had caused [C]hild to be without essential parental care, control or subsistence necessary for her physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by [Father], under 23 Pa.C.S[A.]. §[]2511(a)(2)[?]

3. Whether the trial court abused its discretion in finding that [CYS] had proven by clear and convincing evidence that the [C]hild had been removed from the care of [Father], by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, that [Father] cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to [Father] are not likely to remedy the conditions which led to the removal or placement of the [C]hild within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the [C]hild under 23 Pa.C.S.[A.] §[]2511(a)(5)[?]

4. Whether the trial court abused its discretion in finding that [CYS] had proven by clear and convincing evidence that the [C]hild has been removed from the care of [Father] by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the [C]hild continue to exist and termination of parental rights would best

- 9 -

serve the needs and welfare of the [C]hild under 23 Pa.C.S.[A.] §[]2511(a)(8)[?]

5. Whether the trial court abused its discretion in finding that "the aggravating circumstance of record with regard to abandonment" … existed, when a finding of [a]ggravated [c]ircumstances had been made against [M]other of the [C]hild, but had not been made against [Father?] (WITHDRAWN)[FN 1]

6. Whether the trial court abused its discretion in ordering the involuntary termination of [Father's] parental rights, despite the fact that the inability of [Father] to perform parental duties and achieve the objectives of the [FSP] where [*sic*] wholly or primarily due to his incarceration[?].

_____

[FN 1] The inclusion of this issue was erroneously asserted by [Father]. The trial court did enter an [O]rder finding [a]ggravating [c]ircumstances against both [M]other and [F]ather on March 14, 2019. Thus, this issue is hereby withdrawn from the instant appeal and shall not be discussed further *infra*.

Father's Brief at 8-11 (footnote in original).[8]

Thus, Father argues that CYS has not met its burden with respect to 23

Pa.C.S.A. § 2511(a). In reviewing an appeal from a decree terminating

parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept

_____

[8] Father has waived any challenge to section 2511(b) by his failure to raise it in his concise statement and brief on appeal. ***See Krebs v. United Refining Co.***, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues). Nevertheless, we would find such a challenge lacks merit for the reasons set forth *infra*.

the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation omitted).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a), along with consideration of section 2511(b).  **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).  We will address subsections 2511(a)(1), (2) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (b).

- 12 -

With respect to subsection 2511(a)(1), our Supreme Court has held as follows:

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1988).

Further, this Court has stated that

> the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 854-55 (Pa. Super. 2004) (citations omitted).

To satisfy the requirements of section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may

include acts of refusal as well as incapacity to perform parental duties. ***In re A.L.D.***, 797 A.2d 326, 337 (Pa. Super. 2002).

Our Supreme Court has addressed the termination of parental rights of incarcerated parents under section 2511(a)(2), stating that

> incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under [section] 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and [ ] the causes of the incapacity cannot or will not be remedied.

***In re Adoption of S.P.***, 47 A.3d at 828; ***see also In the Interest of C.S.***, 761 A.2d 1197, 1201 (Pa. Super. 2000) (stating that "an incarcerated parent's responsibilities are not tolled during his incarceration." (citation omitted)).

This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). ***See In re Adoption of C.L.G.***, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa. Super. 2012). In ***In re E.M.***, [533 Pa. 115, 121, 620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the

- 14 -

> effect on the child of permanently severing the parental bond. ***In re K.M.***, 53 A.3d at 791.

***In re: T.S.M.***, 71 A.3d 251, 267 (Pa. 2013). When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." ***In re Z.P.,*** 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted).

> A parent's abuse and neglect are likewise a relevant part of this analysis:

> Concluding [that] a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. … Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

***In re K.K.R.-S.***, 958 A.2d 529, 535 (Pa. Super. 2008) (citations and quotation marks omitted); ***see also In re K.Z.S.***, 946 A.2d 753, 763 (Pa. Super. 2008) (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of his … child is converted, upon the failure to fulfill his … parental duties, to the child's right to have proper parenting and fulfillment of [the child's]

potential in a permanent, healthy, safe environment." ***In re B.,N.M.***, 856

A.2d at 856 (internal citations omitted).

Father acknowledged the lack of a bond between him and Child because

he had not seen Child in a long time. N.T., 10/31/19, at 64. The following

exchange then took place between the trial court and Father:

> THE COURT: Somehow, I believe that you -- believe you when you say you love her. … [S]ometimes when you love someone you also have to let them go. I'm not hearing any evidence really that you are able to take care of her. Give me all you got.

> [FATHER]: Well, I just -- I just know that I -- messed up and I'm trying to do the right thing. (inaudible) right thing. Just -- I mean, I have plea court here in November. I'm supposed to most likely go to rehab, a halfway house, get my life back on track. I mean, I have certifications in auto mechanics and diagnostics[,] so I can get a job anywhere like any auto mechanic place will hire me in like two seconds so, I mean, I can do what I need to do[,] I just need a chance to do it.

> THE COURT: You don't believe you've been given that?

> [FATHER]: I mean, I messed up.

> ….

> THE COURT: It's a lot [*sic*] late, isn't it? I mean, no one can take the fact away that you are her natural [F]ather[,] and I suppose that there's an enormous regret here in a lot of different ways. But what we know is that [Child] needs permanency. She needs every minute of every day to know who, what, when, where and how she's safe[,] not traumatized by prison or really anything. I very much support children visiting their parents in the prisons[,] and I try to make sure that that happens, and I realize it can be traumatic for both the mother or father and/or the child.

> But in recognizing how this all got started[,] that [Child] was born apparently with indications that she had illegal substances in her body…. I see how [Child] can be a motivator for you to do good[,] and that we can in fact break that today, but this proceeding has to be about [Child] and not you. I don't see any

evidence of any bond.  If we brought [Child] in here again, she wouldn't know you, would she?

[FATHER]: No.

THE COURT: And, this idea of -- of an aggravated determination based on abandonment, I mean, that doesn't happen easily, but it's already happened.  So, by definition, you abandoned [Child]?

[FATHER]: Most -- most of the time that I've been away [Child], I was in jail.

THE COURT: And, not because of simply one crim [*sic*] -- crime, right?  A series of things?

[FATHER]: No, most of it was just probation violation.

THE COURT: Well, --

[FATHER]: I mean, now I have a new charge.

THE COURT: So, when you're out of jail, you either violate or have new charges?

[FATHER]: I wouldn't say that but –

THE COURT: When was this [P]etition filed?

[FATHER'S COUNSEL]: July 24th, Your Honor.

THE COURT: '19?

[FATHER'S COUNSEL]: Yes.

THE COURT: So, what did you do for the six months before July 24th to take care of [] [C]hild?

[FATHER]: I was in jail.

[THE COURT]: So, you were unavailable?

[FATHER]: Correct.

….

THE COURT: So, the rules require me to consider the allegations against you[,] and I'm just going to give you a chance to respond to them completely. The first one is that[,] by conduct, continuing for a period of at least six months, immediately preceding the filing of the [P]etition[,] which seems to be the beginning of August now and six months before that[,] that you evidence the settle[d] purpose of relinquishing parental claim to a child[,] and have failed to perform parental duties. I think you've admitted you were incarcerated, and that's also a failure, right?

[FATHER]: Right.

THE COURT: And, the second one is the repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for her physical and mental wellbeing[,] and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parents. I mean, that paragraph goes directly to the issue that, you know, if you were incarcerated, that's one issue. You're certainly not able to provide[,] but [it] is your continued criminal convictions and/or imprisonment that makes it so that you are not remedying the issues, right? You didn't -- you – you're back at [it] again, [] which I regret for you.

And [] [C]hild has been removed from the care of you, but she's never really been in the care of you, has she?

[FATHER]: Right. No.

THE COURT: And, under a voluntary agreement, no. The conditions which led to [Child's] guardianship by the Agency within a reasonable period of time, you didn't accept services or reasonably -- that were made reasonably available to you to remedy the circumstances that best serve the needs and welfare of the child and you. You weren't able to assume any help by the Agency because of your drug addiction, would you say?

[FATHER]: Yes.

THE COURT: And, that the [C]hild was removed by [c]ourt Order twelve months or more elapsed from that date. Any follow[-]up to that?

[FATHER'S COUNSEL]: No, Your Honor.

[CYS'S COUNSEL]: No, I think the facts pretty much we've listed in the [P]etition.

[CHILD'S COUNSEL]: No questions, Your Honor.

THE COURT: Any statements from the GAL?

[GAL]: Yes, Your Honor.  Just a couple of different things.  I would echo what [] Stewart said.  I've also gone up and visited [Child] at the pre-adoptive home.  She's been there for a significant amount of time.  …  She has an extremely strong bond with this pre-adoptive family[,] not just with just all of the members of the household[,] but with their family friends[,] and their extended family beyond that.  This girl has a bright future ahead of her in that family[,] and I think that the evidence has been very clear today that shows this -- this [C]hild deserves permanency and looking forward[,] and it's very clear what needs to happen.

THE COURT: Anyone else?

….

[FATHER'S COUNSEL]: No, Your Honor, I think [Father] has already expressed his desires and this is as well as I can do now[,] so I'm not --  no further witnesses.

THE COURT: Anything else you want to say, [Father]?

[FATHER]: Not particularly[,] just that if I were given a chance to do it right, I would do it right.

….

THE COURT: I understand.  AND NOW, this day in the interests of [CHILD], … in consideration of the [P]etition and Title 23 § 2511(a), and the allegations with regard to paragraphs 1, 2, 5 and 8, the [trial court] finds, pursuant to Title 23 [Pa.C.S.A.] § 2511(b), there is no bond between the Father and the [C]hild.

And, pursuant to the GAL recommendation and the evidence presented, we find that[,] for at least six (6) months preceding

- 19 -

> the filing of the [P]etition, Father … has evidenced his inability to care [for] and maintain the welfare and needs of the [C]hild[,] and we do this also recognizing that there is a history of repeated and continued incapacity, neglect and/or refusal of Father to care for the [C]hild.

N.T., 10/31/19, at 64-72.

The trial court appropriately considered Father's incarceration in addressing the evidence offered to support the termination of Father's parental rights under section 2511(a)(1), (2), and (b). Pursuant to section 2511(a)(1), the trial court considered the testimony that established that, for at least the six months preceding the filing of the termination Petition, Father had a settled purpose to relinquish his parental rights and/or refused to perform his parental duties with regard to Child. The trial court also considered Father's explanation for his conduct, consisting of his running from the law, his history of incarcerations, and his substance abuse. The court considered Father's post-abandonment contact with Child, consisting of one unsuccessful visit at the Greene County Jail.

Regarding section 2511(a)(2), Father's lack of progress with his court-ordered goals, and his time spent in prison, have caused Child to be without essential parental care, control or subsistence necessary for his physical or mental well-being. Father was court-ordered to attend mental health, and drug and alcohol assessments, and to comply with recommendations throughout the history of the case, but failed to do so. Father's FSP also directed Father to complete parenting classes and SAFE parenting classes,

obtain and maintain adequate housing, and maintain contact with CYS, all of which he failed to do. The primary concern is Father's lack of parenting, and Father's continuous and repeated incarcerations, which have resulted in a lack of a bond between Child and Father, which Father acknowledges. Father has had ample time to remedy the conditions that led to the removal of Child, and those conditions continue to exist. Father's repeated and continued incapacity, abuse, neglect or refusal to parent has caused Child to be without essential parental care, control or subsistence necessary for her physical or mental well-being, and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by Father.

Finally, the court considered the effect of termination of Father's parental rights on Child pursuant to section 2511(b), which the trial court found to be of no import. Father admits there is no bond between him and Child, and he has done nothing to address Child's needs and welfare and her best interests. This Court has explained that a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. Although Father states he loves Child, "a child's life simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *In re Z.S.W.*, 946 A.2d 726, 733 (Pa. Super. 2008) (citation and quotation marks omitted).

Accordingly, there was competent evidence in the record from which the trial court could properly conclude that the termination of Father's parental

rights was appropriate pursuant to section 2511(a)(1) and (2), and that termination of Father's parental rights serves Child's needs and welfare and is in her best interests under section 2511(b). The record supports the trial court's factual findings, and we discern no abuse of discretion or error of law in the trial court's legal conclusions. *In re Adoption of S.P.*, 47 A.3d at 826-27; *In re: T.S.M.*, 71 A.3d at 267. Therefore, Father is not entitled to relief on his claims.

Based upon the foregoing, we affirm the Order terminating Father's parental rights to Child.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/9/2020